## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | Ian H. Levin |
|---|---|---|---|
| **CASE NUMBER** | 03 C 1780 | **DATE** | 1/15/2004 |
| **CASE TITLE** | Caprise Manney vs. Jo Anne Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter report and recommendation recommending that plaintiff's motion for summary judgment be granted insofar as it requests a remand and recommends that defendant's motion for summary judgment be denied is hereby entered of record. Accordingly, it is recommended that the cause be remanded, pursuant to sentence four of 42 U.S.C. § 405, to the Commissioner for further proceedings consistent with this opinion. All matters relating to the referral of this action having been resolved, the case is returned to the assigned judge.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **2** number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | JAN 1 6 2004 date docketed | |
| | Notified counsel by telephone. | | | 23 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | 1/15/2004 date mailed notice | |
| ✓ | Copy to judge/magistrate judge. | | | |
| SM courtroom deputy's initials | | | SM mailing deputy initials | |

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
JAN 1 6 2004

| | | |
|---|---|---|
| CAPRISE MANNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Case No. 03 C 1780 |
| v. | ) | |
| | ) | District Judge Joan B. Gottschall |
| JO ANNE B. BARNHART, | ) | Magistrate Judge Ian H. Levin |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Caprise Manney (hereinafter "Plaintiff") brings this action pursuant to 42 U.S.C. §

405(g) for judicial review of the final decision of the Commissioner of the Social Security

Administration denying her application for Social Security Income (hereinafter "SSI") benefits under

Title XVI of the Social Security Act (the "Act"). Before the Court are the parties cross-motions for

summary judgment in the cause. For the reasons set forth below, the Court recommends that the

cause be remanded for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

On November 20, 1998, Plaintiff applied for SSI benefits alleging *inter alia* that she became

disabled due to back impairments and a lung disease.[1] (R. 30-36, 65-67.) Plaintiff's application for

benefits was initially denied on August 27, 1999. (R. 30-33.) Subsequently, on October 29, 1999,

Plaintiff's request for reconsideration was also denied. (R. 34-38.) Plaintiff then filed a timely

---

[1]References are to the certified administrative record prepared by the Commissioner and
filed with this Court pursuant to 42 U.S.C. § 405(g).

23

request for an administrative hearing and, on February 27, 2001, Plaintiff appeared with counsel and testified at a hearing before an Administrative Law Judge ("ALJ"). (R. 39, 192-223.) A vocational expert also testified at the administrative hearing. (R. 223-30.)

On March 28, 2001, the ALJ issued her decision finding that Plaintiff was not disabled. (R. 15-21.) Plaintiff then filed a request for review of the ALJ's decision, and, on January 31, 2003, the Appeals Council denied Plaintiff's request for review making the ALJ's decision the final decision of the Commissioner. (R. 5-6, 8-11.) Pursuant to 42 U.S.C. § 405(g), Plaintiff initiated this civil action for judicial review of the Commissioner's final decision.

## BACKGROUND FACTS

### I. PLAINTIFF'S BACKGROUND/TESTIMONY

Plaintiff was born on January 12, 1965, and was thirty-six years old at the time of the administrative hearing. (R. 20.)

At the hearing, Plaintiff testified that she lived in subsidized housing with her three children and boyfriend. (R. 193-94.) She stated she had attended an alternative high school and completed approximately the eleventh grade. (R. 195.) Plaintiff testified she had worked at several jobs in the past,[2] but she had not held any of them for any length of time because the jobs were "too strenuous

---

[2]Plaintiff last worked as a cashier in December of 2000 for only three days due to her back pain. (R. 196-97.) Prior to that time, in February or March of 2000, Plaintiff worked as a receptionist for a week and a half, but left the job because she constantly needed to "move around" when she was supposed to be sitting and answering the telephone. (R. 197.) The receptionist job also required that Plaintiff lift bags of frozen foods which she stated were "real painful." (R. 197.)

In March of 1999, Plaintiff indicated on her Work History Report that she had worked as a sales clerk, waitress, hostess, cashier, mail and fax deliver, and unloader. (R. 98.)

on [her] back." (R. 196.) Plaintiff took each job assuming that she was going to work for long periods of time, but due to her back problems, she found herself calling in often or not going into work at the scheduled time because her back hurt to the point where she could not stand. (R. 196.) She testified she thought she could do a job where she could alternate between standing up and sitting down, but she was unable to do even these types of jobs because her back pain was getting progressively worse, and when she alternated between standing up and sitting down, she found that "the pressure [was] still on [her] back. [H]er leg [also] [became] numb and it [got] real uncomfortable to sit or stand." (R. 196.)

Plaintiff stated she frequently went to either the emergency room or hospital for medical treatment. (R. 198, 203.) For instance, Plaintiff was last treated in the hospital, in December of 2000, when she was admitted after an emergency room visit for back pain and muscle spasms in her leg. (R.198.) During her hospitalization, Plaintiff testified that she underwent several tests which also revealed she had pneumonia, high blood pressure and her lung disease was out of control. (R. 198.)

Plaintiff testified that her orthopedist, Dr. Smith, who worked at Mercy Hospital and Medical Center, advised her to quit her job because her back was not going to get any better. (R. 201.) She also indicated that Dr. Smith had given her a back brace to wear. (R. 201.) Plaintiff testified she would wear the back brace most of the day for support, however, it did not relieve her back pain once it had begun. (R. 202.) She indicated, however, that the only thing that eased her back pain were hot baths. (R. 202.)

Plaintiff stated she experienced extreme pain in her lower back, particularly on the left side, "as if something is rubbing and pressing up against a nerve." (R. 204.) She indicated that this pain also caused trembling and numbness in her legs. (R. 204.) Plaintiff testified she had muscle spasms

3

in her left leg and her leg muscles would become very sensitive to touch. (R. 204.) She stated that while walking she experienced constant pain in her leg and walked with a limp. (R. 204.) Plaintiff indicated she experienced pain in her back and leg which was severe enough to affect her concentration. (R. 219.) She testified that during these painful periods, she was "usually trying to think of ways to relieve [the] pain. And at that point nothing else . . . is important, because it's such a terrible pain." (R. 219.) Plaintiff stated she is never able to relieve the pain totally; rather, she is only able to stop the pain from "hurting to an extreme." (R. 219.) She indicated her daughter massages her leg and she takes between five and six baths a day to relieve the pain in her leg. (R. 220.) Plaintiff testified that when she was standing or sitting, she bore her weight primarily on her right side to keep pressure off of her left side (i.e., left knee).[3] (R. 221.) She indicated that she would "press down on the low[er] part of [her] back" in order to "keep[] the pain in an isolated position." (R. 221.) Plaintiff further stated that when she needed to pick things up off the floor, she would bend at the knees (stoop) rather than at the waist. (R. 221-22.)

Plaintiff testified that she had difficulty sleeping due to pain in her left leg. (R. 218.) She indicated she typically went to bed between 9:00 p.m. and 10 p.m. and during the night she would wake up at around 1:00 a.m. because either her leg was hurting or she just could not sleep. (R. 218.) Plaintiff would stay up for a couple of hours and then go back to sleep. (R. 218.) She stated that she would then have to get up because she needed to get her kids ready for school. (R. 218.) Plaintiff indicated she felt sluggish and tired during the day because of lack of sleep. (R. 219.) She testified she attempted to sleep during the day, but she was not able to sleep because she is restless and her

---

[3]During the administrative hearing, Plaintiff stood up and leaned against the wall because her leg was going numb and her back started to hurt. (R. 215, 221.)

4

leg hurt to the point where "it's really uncomfortable." (R. 219.)

Plaintiff stated she had uncontrolled blood pressure which caused her to have a constant headache. (R. 202, 205.) She indicated she also had constant heartburn due to the medications she took, her chest hurt due to her lung disease, her left arm was sometimes sore, and her muscles and joints were always achy. (R. 205-06.) Plaintiff further testified that she was told she has severe arthritis and that when the weather changes and it rains, she is constantly aching. (R. 206.)

With respect to Plaintiff's lung disease, in addition to her lungs causing her chest to hurt, she testified she coughed up mucus several times throughout the day. (R. 205, 217.) She also stated it was difficult for her to walk outside when the weather was cold because cold air irritated her chest which caused her to spit up mucus. (R. 206.) Plaintiff testified that Dr. Ray, her pulmonologist, asked her to keep track of the color of her mucus to determine if she had had respiratory infections and, in fact, she had several such infections in the past. (R. 203, 217.) She further indicated that before the administrative hearing, she had vomited a lot of mucus because she was walking to the hearing at a somewhat accelerated pace which caused her to gag and choke. (R. 217.) Plaintiff also testified that on the way to the hearing, she "had to keep going inside buildings because it was cold." (R. 211.) Moreover, Plaintiff stated her lungs were irritated by dust and certain household cleaning products. (R. 217-18.)

Plaintiff indicated she was able to walk "maybe a block depending on the weather." (R. 206.) She testified she walked "slower than the average person." (R. 217.) Plaintiff stated that walking and talking at the same time caused her to become short of breath. (R. 206.) She testified she is unable to stand in one spot for more than about a half an hour to an hour because she would begin to "feel [] pressure" in her back. (R. 207.) Plaintiff stated she could sit for about forty-five minutes

before she would need to get up and move around. (R. 207.) She also indicated she does not lift more than five pounds because the weight "pulls on [her] back and it hurts." (R. 207.) Moreover, she testified that she tried not to carry anything. (R. 207.)

When asked about her daily activities, Plaintiff stated, that in the morning, she typically made her children breakfast before they went to school, took a hot bath, and "attempt[ed] to pick up around the house." (R. 208.) Plaintiff testified that, after she completes these activities, she would need to sit in her recliner with her feet elevated. (R. 208.) After sitting for a while, she would need to get up and walk around the house because of her back and leg pain. (R. 208.) Plaintiff stated her four year old son would be at home with her during the day, but when her boyfriend (i.e., her son's father) was not working, he cared for their son.[4] (R. 208-09.) She indicated her boyfriend would give their son baths and play with him. (R. 209.) Plaintiff testified she was unable to give their son baths or play with him because she "can't bend over." (R. 209.)

Plaintiff indicated that she and her daughter cooked the meals and sometimes she was able to wash the dishes, but her children did the cleaning, vacuuming, and dusting. (R. 209-10.) Plaintiff stated she did laundry some of the time, could make her bed, and bathed and dressed herself. (R. 210.) She indicated that sometimes she would go grocery shopping or she would send her daughter to get the groceries. (R. 210.) Plaintiff testified she lives two blocks away from the grocery store and typically takes her daughter to the store with her. (R. 210.) She stated she could not walk and carry a bag of groceries at the same time and if she goes to the store, she is accompanied by "someone [who] can carry the bags." (R. 206-07.) Plaintiff indicated she is no longer able to window

---

[4]At the time of the administrative hearing, Plaintiff testified her boyfriend worked for a temporary services agency and he had last worked in December of 2000. (R. 209.) She also stated he had been in a car accident and he no longer worked. (R. 209.)

shop, but she takes her children out to eat. (R. 212.) She further testified she would attend church two to three times per month, if her back and legs were not hurting. (R. 212.) Plaintiff also indicated that the church bus would pick her up for church services. (R. 212.) She stated she would occasionally go to her daughter's chorus club performances if she was able to get a ride to her daughter's school. (R. 213.) Plaintiff testified she would sometimes attend parent-teacher conferences, but the school would usually contact her by telephone because they knew about her health problems. (R. 213-14.)

Plaintiff stated that every day she took Prednisone[5] for her lung disease, Atenolol[6] for high blood pressure, Prevacid[7] for acid reflux disease (twice a day), and used an inhaler (Albuterol)[8] (two puffs twice a day). (R. 200.) She testified she was also prescribed Atrovent[9] (inhaler) and Flonase[10]

---

[5]Prednisone (also called Deltasone) is "a steroid drug . . . used to reduce inflammation and alleviate symptoms in a variety of disorders, including rheumatoid arthritis and severe cases of asthma." It is also used to treat lung diseases. *The PDR Family Guide to Prescription Drugs* (hereinafter "*PDR Family Guide*") 164-65 (6th ed. 1998).

[6]Atenolol (also called Tenormin) is "used in the treatment of high blood pressure, angina pectoris . . ., and heart attack." *PDR Family Guide,* at 596.

[7]Prevacid is used for the treatment of heartburn and symptoms associated with gastroesophageal reflux disease. *Physicians' Desk Reference* (hereinafter *PDR*) 3204 (57th ed. 2003).

[8]Albuterol (also called Proventil) is used for "the prevention and relief of bronchial spasms that narrow the airway" which is often associated with asthma. *PDR Family Guide,* at 505.

[9]Atrovent is prescribed for "the long-term treatment of bronchial spasms (wheezing) associated with chronic obstructive pulmonary disease, including chronic bronchitis and emphysema." *PDR Family Guide,* at 50.

[10]Flonase nasal spray is used for the treatment of nasal symptoms of seasonal and perennial allergic and nonallergic rhinitis. *PDR,* at 1522.

(nasal spray), but she no longer had any of these medications because she had exhausted all of her refills. (R. 200-01.) Plaintiff further indicated she had been prescribed about four different pain medications, but she had also exhausted these refills and had been told by her physicians to take various over-the-counter medications in a combination that would alleviate her pain. (R. 201.) She stated she attempted to control her pain with Motrin (nonsteroidal anti-inflammatory pain reliever), Aleve (nonsteroidal anti-inflammatory pain reliever) and Tylenol (pain reliever) using various dosages and combinations, but these medications "[did] not stop the pain. [They] make[] it bearable." (R. 205.) Plaintiff further indicated that her medications caused her to have difficulty sleeping. (R. 206.)

Plaintiff testified that she did not have health insurance; however, she did have a medical card from public aid. (R. 215, 221.)

## II.     MEDICAL EVIDENCE

On May 22, 1998, Plaintiff sought medical treatment for back pain at Mercy Hospital and Medical Center. (R. 127.) Plaintiff reported, at the time, she was always picking up heavy objects that she should not be carrying. (R. 127.) Moreover, the medical record from that day indicates that Plaintiff had not seen a physician since August of 1997. (R. 127.)

On May 28, 1998, Plaintiff again sought medical treatment at Mercy Hospital and Medical Center for back pain. (R. 128.) At that time, Plaintiff reported she began having back pain after she had received an epidural[11] during the delivery of her first child. (R. 127.) She indicated that the pain was in her lower back and it was aggravated by movement, especially when bending down. (R. 127.)

---

[11]An epidural is a local anesthetic which is injected into the space that surrounds the spinal cord (epidural space) in the lower back. Robert Berkow *et al.*, *The Merck Manual of Medical Information – Home Edition* (hereinafter "*Merck Manual*"), 1176 (1st ed. 1997).

Plaintiff also stated that she had injured her left knee two years earlier and her knee was painful, particularly when she climbed stairs. (R. 127.) Plaintiff further reported that her back pain was relieved when she took Motrin (i.e., 400 milligrams) two to three times a day. (R. 128.)

Upon examination, Plaintiff's sensory and motor function were intact. (R. 128.) Plaintiff had good extension and sideways movement, but was unable to bend beyond 140 degrees due to back pain. (R. 128.) An examination of Plaintiff's left knee showed no swelling or tenderness, and she had good range of motion. (R. 128.) An X-ray examination of Plaintiff's lumbosacral spine showed a marked narrowing of the L5-S1 vertebral disc spaces and a deficit in the left side of L5-S1, with Grade I spondylolisthesis[12] of L5-S1. (R. 128.) Plaintiff was diagnosed with chronic back pain, prescribed pain medication, given back exercises to perform, and instructed not to lift any objects over ten pounds. (R.128.)

On June 25, 1998, Plaintiff underwent further evaluation for her back and knee pain. (R. 129.) Upon examination, Plaintiff was unable to bend beyond 140 degrees due to her back pain. (R. 129.) An examination of Plaintiff's left knee showed no swelling and she had good range of motion. (R. 129.) In addition, Plaintiff was referred for an orthopedic evaluation. (R. 129.)

On July 14, 1998, Plaintiff underwent an orthopedic evaluation for her back pain. (R. 130.) At that time, Plaintiff reported she had suffered from back pain since 1985 when she received an epidural during the birth of her first child. (R. 130.) She also reported that she had left knee pain, however, the pain was "not as bad." (R. 130.) Upon examination, Plaintiff's straight leg raising was

---

[12]Spondylolisthesis is the forward displacement of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth, usually due to a developmental defect in the pars interarticularis (the part of the lamina between the superior and inferior articular processes of a lumbar vertebra). *Dorland's Illustrated Medical Dictionary* (hereinafter "*Dorland's*"), 1237, 1563 (28th ed. 1994).

negative, and her reflexes were brisk and symmetrical. (R. 130.) At the evaluation, Plaintiff was advised to lose weight and perform back exercises. (R. 130.)

On July 30, 1998, Dr. Suvant Suvanich, M.D., performed a consultative examination of Plaintiff. (R. 131-34.) During the examination, Plaintiff stated she had suffered from lower back pain and numbness in her left calf area for about nine years. (R. 131.) She indicated that the pain is rather constant in her lower back area and radiates to the back of her left calf. (R. 131.) Plaintiff reported she has difficulty getting up in the morning due to stiffness. (R. 131.) She stated that the pain is constant at night when she is lying down and she has two to three episodes per week of getting up at night crying because of the pain. (R. 131.) Plaintiff further reported that her pain is relieved by taking Motrin. (R. 131.) She also stated that she was seen by orthopedic surgeons in 1997 and 1998 and was given physical therapy manuals to do exercises at home. (R. 131.) Moreover, Dr. Suvanich noted that Plaintiff never had a diagnostic work up; such as computed tomography ("CT") and/or magnetic resonance imaging ("MRI") evaluations. (R. 131.)

At the time of the examination, Plaintiff reported that she could stand for about an hour and then needed to sit down due to pain. (R. 132.) Plaintiff indicated that she was able to walk about half of a mile and then needed to sit down due to numbness in her leg. (R. 132.) She stated that she had difficulty going up and down the stairs to her third floor apartment and had to stop two to three times while going up or down the stairs. (R. 132.) Plaintiff also reported that she was still working on a part-time basis as a waitress approximately five hours a day, five days a week. (R. 131.)

Upon examination, Plaintiff walked with a normal gait and her range of motion was normal with respect to her shoulder, elbow, wrist, hip, knee and ankle joints. (R. 132-33.) Plaintiff's grips were strong and equal, and there was no swelling or effusion of the knee joints. (R. 133.) An

10

examination of Plaintiff's musculoskeletal system showed no weakness of the muscles in her upper or lower extremities. (R. 133.) She also had no limitation of motion of her cervical spine with respect to flexion, hyperextension and rotation. (R. 133.) Plaintiff, however, exhibited limited flexion and extension, 0 to 30 degrees (out of a possible 90 degrees) as well as limited lateral rotation, 10 degrees bilaterally (out of a possible 25 degrees) of her lumbosacral spine.[13] (R. 133, 136.) Her straight leg raising test was negative on the right, but positive on the left (i.e., 0 to 30 degrees). (R. 133.) There was no muscle weakness in Plaintiff's lower extremities, and she could walk on her toes and heels without difficulty. (R. 133.)

Dr. Suvanich's neurological examination of Plaintiff showed some loss of sensation to touch and pinprick on the left calf area along the sciatic nerve up to the L5-S1 level of her lumbosacral spine. (R. 133.) Dr. Suvanich also noted tenderness along the lumbosacral spine at the L5-S1 level. (R. 133.) Dr. Suvanich diagnosed Plaintiff with chronic lower back pain of the lumbosacral spine at the L5-S1 level with radiculitis.[14]

On August 11, 1998 and December 15, 1998, Plaintiff failed to keep her medical appointments. (R. 130, 176.)

On August 11, 1999, Dr. Boyd McCracken, M.D., a state agency physician, reviewed Plaintiff's medical record and completed a Physical Residual Functional Capacity Assessment form.

---

[13]While Dr. Suvanich's report states "There was no limitation of motion of [Plaintiff's] lumbosacral spine," the sentence that immediately follows states, "There was some limitation of motion of flexion and extension, only 0 to 30 degrees and lateral rotation is 10 degrees on both sides." This subsequent statement refers to Plaintiff's lumbosacral spine and these stated limitations are reflected on a chart labeled "lumbar spine" completed by Dr. Suvanich. (R. 133, 136.)

[14]Radiculitis is an inflammation of the root of a spinal nerve, especially the portion of the root which lies between the spinal cord and the intervertebral canal. *Dorland's,* at 1404.

11

(R.137-44.) Dr. McCracken opined that Plaintiff could lift fifty pounds occasionally and twenty-five

pounds frequently, stand and walk for about six hours in an eight hour workday, sit for about six

hours in an eight hour workday, and had unlimited pushing and pulling abilities. (R. 138.) Moreover,

Dr. McCracken indicated that Plaintiff could climb, balance, kneel, crouch and crawl without

limitation, but she could stoop only occasionally because the reduced range of motion in her back

"may prevent more than occasional stooping." (R. 139.) Dr. E.C. Bone, a state agency physician,

subsequently concurred in Dr. McCracken's assessment of Plaintiff. (R. 144.)

On August 30, 1999, Plaintiff was treated by physicians at Palatine Internal Medicine for

pneumonia and flu-like symptoms. (R. 156.) At that time, it was noted that Plaintiff needed to

undergo a mediastinoscopy[15] to rule out sarcoidosis[16] or lymphoma[17] because an abnormal chest X-

ray examination revealed enlarged lymph nodes in the area of her mediastinum.[18] (R. 146, 156.) A

CT scan, at the time, was done which showed the presence of lesions concentrated in Plaintiff's

---

[15]Mediastinoscopy is "the direct visual examination of the area of the chest between the
two lungs (the mediastinum) through a viewing tube (mediastinoscope). The mediastinum
contains the heart, trachea, esophagus, thymus, and lymph nodes." *Merck Manual*, at 163.

[16]Sarcoidosis is a "disease in which abnormal collections of inflammatory cells
(granulomas) form in many organs in the body . . . Granulomas commonly appear in the lymph
nodes, lungs, liver, eyes, and skin . . . The symptoms of sarcoidosis vary according to the site and
extent of the disease. Fever, weight loss, and aching joints may be the first indications of a
problem . . . The organ most affected by sarcoidosis is the lung. Enlarged lymph nodes at the
place where the lungs meet the heart or to the right of the trachea may be seen on a chest x-ray.
Sarcoidosis produces inflammation in the lungs that may eventually lead to scarring and cyst
formation, which can cause coughing and shortness of breath. Severe lung disease can eventually
weaken the heart." *Merck Manual*, at 192-93.

[17]Lymphoma is a cancer (malignancy) of the lymphatic system. *Merck Manual*, at 770.

[18]The mediastinum contains the heart, trachea, esophagus, thymus, and lymph nodes.
*Merck Manual*, at 163.

hilar[19] area bilaterally. (R. 146.) Moreover, treatment notes indicated that Plaintiff was in the process of applying for public aid. (R. 156.)

On September 3, 1999, a pulmonary interpretation report indicated that Plaintiff has a mild obstructive lung defect that has minimal improvement with a bronchodilator.[20] (R. 150.) Moreover, the report indicated that Plaintiff's lung volumes and her diffusion capacity were within normal limits. (R. 150.)

On September 10, 1999, Plaintiff underwent a mediastinoscopy. (R. 147.)

On September 13, 1999, Plaintiff was treated in the emergency room at Northwest Community Hospital for chest pains and shortness of breath. (R. 160.) Plaintiff was diagnosed with atypical chest pain as well as possible bronchitis and sarcoidosis. (R. 161.)

On September 15, 1999 and September 16, 1999, Plaintiff contacted physicians at Palatine Internal Medicine and requested that paperwork be completed indicating that she was temporarily unable to work. (R. 158-59.)

On October 15, 1999, Dr. Ali N. Shariatzadeh, M.D., reported that, during Plaintiff's mediastinoscopy (performed on September 10, 1999), it had been difficult to reach the lesion identified by prior diagnostic medical tests due to Plaintiff's deep chest. (R. 147, 164.) However, Dr. Shariatzadeh reported that a biopsy of the tissue surrounding the lesion had been performed and it showed noncaseating granulomas (abnormal collections of inflammatory cells). (R.151, 164.) Dr. Shariatzadeh further indicated that Plaintiff should have a follow-up CT scan or X-ray evaluation

---

[19]Hilar pertains to a hilum which is a general term for a depression or pit at that part of an organ where the vessels and nerves enter. *Dorland's*, at 767.

[20]Bronchodilator is an agent that causes expansion of the lumina of the air passages of the lungs. *Dorland's*, at 231.

to determine if there was any enlargement of the lesion. (R. 164.)

On November 15, 1999, Plaintiff was once again treated for back pain.[21] (R. 176-77.)

On December 3, 1999, Plaintiff sought treatment at Mercy Hospital and Medical Center for chest pain. (R. 175.) A chest X-ray examination, at the time, showed an interval development of diffuse interstitial infiltrates in both lungs, as well as hilar and right paratracheal (adjacent to the trachea) adenopathy,[22] which is consistent with a clinical history of sarcoidosis. (R. 184.)

On December 10, 1999, Plaintiff was evaluated and it was noted that her symptoms were consistent with sarcoidosis. (R. 173.) Plaintiff was prescribed Prednisone and Flonase. (R. 173.)

On December 13, 1999, Plaintiff sought treatment for sarcoidosis.[23] (R. 170-71.)

On December 30, 1999, Plaintiff underwent an MRI of her lumbar spine. (R. 183.) The results of the MRI showed bilateral spondylolysis of the neural arch of L5, facet arthropathy (joint disease) at the lumbosacral junction, and anterior Grade I spondylolisthesis of L5 on S1. (R. 183.) Moreover, the axial images suggested "a mild spinal canal stenosis at L5/S1 primarily from the forward subluxation of segment of the lumbosacral junction." (R. 183.)

On January 3, 2000, Plaintiff failed to keep her medical appointment. (R. 168.)

On January 7, 2000, Plaintiff was seen for a follow-up examination and reported that she had been hospitalized from December 23, 1999 to December 24, 1999 for chest pain and, during her hospitalization, she was diagnosed with high blood pressure. (R.168.) Plaintiff further indicated she

---

[21]The treatment notes from this visit, however, are illegible. (R. 176-77.)

[22]Adenopathy involves the enlargement of the glands, in particular, the lymphatic glands. *Dorland's*, at 28.

[23]The treatment notes from this visit, however, are illegible. (R. 170-71.)

had had a constant headache for two weeks; however, she denied having chest pain or shortness of breath at the time of her follow-up examination. (R.168.) Upon examination, Plaintiff's blood pressure was 135/70 and she had mild crackles in her right lung. (R.169.) Her neurological examination indicated her strength was normal, but she had difficulty with heal-to-toe walking. (R. 169.) Plaintiff was prescribed Atrovent for her cold and headache symptoms and it was noted that her medication for sarcoidosis (Prednisone) was to be reduced. (R. 169.) Moreover, treatment notes from that date indicate that Plaintiff was advised to decrease her fast food and salt intake because she had gained weight. (R. 168.)

On January 27, 2000, a pulmonary function report indicated that Plaintiff has a mild obstructive ventilatory lung defect. (R. 182.)

On April 17, 2000, Plaintiff failed to keep her medical appointment. (R. 167.)

## III. VOCATIONAL EXPERT'S TESTIMONY

Mr. Frank Mendrick, a vocational expert, testified at the administrative hearing on February 27, 2001. (R. 224-29.) At the hearing, the ALJ first asked Mr. Mendrick to classify Plaintiff's previous work. (R. 224.) In response, Mr. Mendrick testified that Plaintiff's previous jobs (i.e., cashier, waitress, hostess, sales clerk, mail sorter, and unloader) ranged in skill level from unskilled to semi-skilled work and entailed light to medium exertional levels. (R. 224-25.)

The ALJ next asked Mr. Mendrick to assume a hypothetical person of Plaintiff's age (35 years old), educational level, and past work experience. (R. 225.) The ALJ asked Mr. Mendrick if a hypothetical person with Plaintiff's exertional limitations who could sit, stand and walk for six hours, lift and carry up to twenty-five pounds frequently and fifty pounds occasionally, stoop occasionally, and avoid concentrated exposure to dust, odors, fumes and gases could perform her

past work. (R. 225.) Mr. Mendrick stated that such an individual could do all of Plaintiff's past work except for the unloader job because it would require more than frequent stooping. (R. 225.) When asked by the ALJ if there were other jobs that an individual with the stated limitations and restrictions could perform, Mr. Mendrick testified that such an individual could also perform work as an inspector at the medium exertional level (2,000 jobs), usher at the light exertional level (4,000 jobs), and information clerk at the light exertional level (4,000 jobs) located in the Chicago metropolitan area (plus Lake and Porter Counties in Indiana). (R. 225-26.) Moreover, when asked if the hypothetical person were only capable of performing light work with the same stated non-exertional limitations, Mr. Mendrick indicated that such an individual could also perform work as a general assembler (10,000 jobs). (R. 226-27.) However, if the hypothetical person had an additional limitation of sitting and standing about every forty-five minutes, Mr. Mendrick testified that the inspector (i.e., cashier and mail sorter), usher, information clerks and general assembler jobs would be available; however, the general assembler jobs would be reduced by 5,000 jobs. (R. 226, 227.)

When asked by the ALJ if there were any jobs Plaintiff could perform, if her statements regarding her restrictions and limitations were accurate in all respects, Mr. Mendrick stated that, "[t]he [claimant] describes a person who isn't available for work on any consistent basis." (R. 227.) Moreover, Mr. Mendrick testified, based on the types of jobs he had quoted, Plaintiff would be unable to sustain any of these jobs, if she were absent more than two days per month due to illness. (R. 228.) Mr. Mendrick further stated that, if as Plaintiff had testified, she would be away from her job task several times a day because of an inability to concentrate due to extreme pain, that would also prevent her from sustaining work. (R. 228.) Mr. Mendrick also testified that if Plaintiff could sit for forty-five minutes, but would then need to stand up, walk around, and perhaps lie down in

16

varying combinations, for more than five minutes, this activity would also prevent her from sustaining work. (R. 228-29.) Furthermore, Mr. Mendrick indicated that if Plaintiff were having problems breathing and spitting up mucus throughout the day, which would prevent her from staying at her workstation during those times, this would also "detract from [her] being able to concentrate on the work long enough" to complete a job task. (R. 229.)

## IV. THE ALJ'S FINDINGS AND DECISION HEREIN

The ALJ determined that Plaintiff had not engaged in any substantial gainful activity at any time since the alleged onset date of her disabling condition. (R. 20.)

The ALJ found that the medical evidence established that Plaintiff suffers from back disorders, bronchitis and sarcoidosis which significantly limits her ability to perform basic work activities; consequently, her impairments are severe. (R. 20.) The ALJ, however, determined that Plaintiff does not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulation No. 4. (R. 20.)

Because the ALJ determined that Plaintiff's impairments did not meet or equal a listed impairment, the ALJ assessed Plaintiff's residual functional capacity (hereinafter "RFC") to determine what she could do despite her limitations. (R. 20.) The ALJ concluded that Plaintiff has the RFC to perform a limited range of medium work[24] which precludes lifting more than fifty pounds occasionally or twenty-five pound frequently; stooping more than occasionally; and performing jobs

---

[24]20 C.F.R. § 416.967(c) provides: "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." Moreover, "[a] full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds." *SSR* 83-10.

in environments containing dust, fumes or any type of respiratory irritant in concentrated levels. (R. 20.) The ALJ also found that Plaintiff was unable to perform her past relevant work. (R. 20.)

The ALJ determined that, in view of Plaintiff's vocational characteristics and RFC, the Medical-Vocational Guidelines were applicable. 20 C.F.R. Pt. 404, Subpt. P, App. 2. (R. 20.) Therefore, using Rule 203.25 as a framework, as supplemented by the VE's testimony, the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy. (R. 19, 20.)

The ALJ further determined that Plaintiff's allegations regarding her limitations were not credible. (R. 20.)

Accordingly, the ALJ determined that Plaintiff was not disabled under the terms of the Act. (R. 21.)

## LEGAL STANDARDS

### I.    STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is limited. The Act at 42 U.S.C. § 405(g) establishes that the Commissioner's findings as to any fact are conclusive if they are supported by substantial evidence. *See also Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Pearles*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Brewer*, 103 F.3d at 1390. The court may not reevaluate the facts, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *See Brewer*, 103 F.3d at 1390. Conclusions of law, however, are not entitled to deference. Thus, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual

findings. *See Binion v. Chater*, 108 F.3d 780, 782 (7ᵗʰ Cir. 1997).

## II.    STATUTORY AND REGULATORY FRAMEWORK

To receive disability benefits, SSI and DIB claimants must be "disabled" as defined by the Act. *See* 42 U.S.C. § 423(a)(1)(D); 42 U.S.C. § 1382(a); *Pope v. Shalala*, 998 F.2d 473, 477 (7ᵗʰ Cir. 1993). An individual is "disabled" if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). *See also Jones v. Shalala*, 10 F.3d 522, 523-24 (7ᵗʰ Cir. 1993). To satisfy this definition, an individual must have a severe impairment that renders her unable to do her previous work or any other substantial gainful activity that exists in the national economy. *See* 20 C.F.R. § 404.1505(a).

The Social Security regulations delineate a five-step process for determining whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. § 404.1520(b). If she is, the claimant is not disabled and the evaluation process is over; if she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. Pt. 404, Subpt. P, App.1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. *See Brewer*, 103 F.3d at 1391.

If the impairment does not so limit the claimant's remaining capabilities, the fourth step is

that the ALJ reviews the claimant's RFC and the physical and mental demands of her past work. RFC is a measure of what an individual can do despite the limitations imposed by her impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). *See also* Social Security Ruling 96-8p (1996). If the claimant can perform her past relevant work, she will be found not disabled. *See* 20 C.F.R. § 404.1520(e).

For the fifth step, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant -- in light of her age, education, job experience and functional capacity to work -- is capable of performing other work and that such work exists in the national economy. *See* 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f). *See also Brewer*, 103 F.3d at 1391.

## ANALYSIS

Plaintiff seeks reversal or remand of the ALJ's decision finding that she is not disabled.

Upon review of the record and applying the applicable legal standard(s), the Court finds that an outright reversal is not warranted. Separately, as it relates to remand, Plaintiff alleges *inter alia* that: (1) the ALJ ignored evidence favorable to Plaintiff; and (2) the ALJ's credibility determination of Plaintiff is insufficient as a matter of law and patently wrong. (Pl.'s Mem. at 8-15.)

## I. THE ALJ IMPERMISSIBLY IGNORED OR FAILED TO ADDRESS RELEVANT MEDICAL EVIDENCE IN DETERMINING THAT PLAINTIFF WAS CAPABLE OF PERFORMING A LIMITED RANGE OF MEDIUM WORK.

Plaintiff avers that the ALJ ignored significant objective medical evidence that was favorable to her disability claim(s). (Pl.'s Mem. at 14.) For example, the ALJ failed to consider and properly interpret medical evidence related to *inter alia* Plaintiff's documented reduced range of motion of her lumbosacral spine, joint and nerve disorders of her lower back and spine, loss of sensation to

touch on her left calf area, and tenderness of her lower back. (*Id.*) Defendant, on the other hand, asserts that the ALJ properly acknowledged such medical findings which included *inter alia* Plaintiff's back disorders (i.e., May, 1998 X-ray showing spondylolisthesis of L5-S1 and marked narrowing of the L5-S1 vertebral disc spaces), decreased range of lumbar motion,[25] positive straight leg raising test, and abnormal chest X-ray examination. (Def.'s Mem. at 16.) Thus, according to Defendant, given the record as a whole, the ALJ reasonably concluded that Plaintiff could perform a limited range of medium work. (Def.'s Mem. at 16-17; R.16-18.)

Initially, the Court finds that the medical evidence in the case, some of it after May, 1998, establishes *inter alia* that Plaintiff suffers from severe lower back and leg pain (and sarcoidosis) which is substantiated by the following objective medical evidence: (1) a December, 1999 MRI of Plaintiff's lumbar spine which shows she has bilateral spondylolysis of the neural arch of L5, facet arthropathy (joint disease) at the lumbosacral junction, and anterior Grade I spondylolisthesis of L5 on S1 (R.183); (2) an X-ray evaluation of Plaintiff's lumbar spine indicating a marked narrowing of the L5-S1 vertebral disc spaces and a deficit in the left side of L5-S1, with Grade I spondylolisthesis (R. 128); (3) limited range of motion with respect to Plaintiff's ability to bend (limited to 140 degrees due to back pain) (R. 128, 129); (4) a neurologic examination by Dr. Suvanich showing loss of sensation to touch and pinprick on Plaintiff's left calf area along the sciatic nerve up to the L5-S1 level of her lumbosacral spine (R. 133); (5) a diagnosis by Dr. Suvanich indicating Plaintiff has

---

[25]The ALJ's opinion actually states that Plaintiff demonstrated good range of motion during the May, 1998 exam, except for bending beyond 140 degrees due to back pain. (R. 17.)

The ALJ further stated that during the consultative examination (in July, 1998), there was no limitation of motion of Plaintiff's lumbar spine, but there was some limitation of motion of flexion and extension. (R. 17.)

chronic lower back pain of the lumbosacral spine at the L5-S1 level with radiculitis (nerve disease) and tenderness along the lumbosacral spine at the L5-S1 level (R. 133); (6) positive straight leg raising (R. 133); (7) limited range of motion with respect to Plaintiff's lumbosacral spine (i.e., limited flexion and extension, 0 to 30 degrees bilaterally as well as limited lateral rotation, 10 degrees bilaterally) (R. 133, 136); and (8) a diagnosis and treatment for sarcoidosis (R. 146, 151, 156, 161, 164, 173, 184). The ALJ, in her decision, however, failed to address these medical findings and how these medical findings and diagnoses would affect Plaintiff's ability to perform a limited range of medium work.

Accordingly, the Court finds that the ALJ erred by ignoring or failing to address relevant medical evidence that is favorable to Plaintiff. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001)(*quoting Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999)("An ALJ may not ignore an entire line of evidence that is contrary to her findings.") Of course, the ALJ need not discuss every piece of evidence (if she has considered the important evidence). *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ, however, omitted mentioning or discussing significant medical evidence in her decision. For example, as stated, the ALJ failed to mention Plaintiff's MRI indicating she suffered from bilateral spondylolysis[26] of the neural arch of L5, facet arthropathy (joint disease) at the lumbosacral junction, and anterior Grade I spondylolisthesis of L5 on S1 (R.183); Dr. Suvanich's neurological examination showing a loss of sensation to touch and pinprick on Plaintiff's left calf area along the sciatic nerve up to the L5-S1 level of her lumbosacral spine (R. 133); Dr. Suvanich's assessment that Plaintiff has chronic lower back pain of the lumbosacral spine at the L5-

---

[26]Spondylolysis is dissolution of a vertebra; a condition marked by platyspondylia, aplasia of the vertebral arch, and separation of the pars interarticularis. *Dorland's*, at 1563.

S1 level with radiculitis (nerve disease) and tenderness along the lumbosacral spine at the L5-S1 level (R. 133); and a diagnosis of and treatment for sarcoidosis. (R.146, 151, 156, 161, 164, 173,184).

In omitting to address relevant evidence favorable to Plaintiff, the ALJ appears to have implicitly relied on other evidence in the record which was unfavorable to Plaintiff.[27] *See e.g., Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1983) (a court will remand a cause if the ALJ fails to give at least a minimal articulation of why the claimant's line of evidence was rejected). Thus, while the ALJ mentions or lists some of the medical evidence, she fails to articulate her basis for either crediting or rejecting specific diagnoses and assessments that are favorable to Plaintiff. *See e.g., Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993)(an ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.'")(citation omitted). For example, while the ALJ mentions Plaintiff's (1) X-ray evaluation of her lumbar spine showing a marked narrowing of the L5-S1 vertebral disc spaces and a deficit in the left side of L5-S1, with Grade I spondylolisthesis (R. 128); (2) good range of motion regarding Plaintiff's ability to bend (except for bending beyond 140 degrees due to back pain); (3) positive straight leg raising (R. 133); and (4) limited range of motion with respect to her lumbosacral spine (i.e., limitation of flexion and extension) (R. 133, 136),

---

[27]For example, the ALJ in her decision states, "Although sarcoidosis was not ruled out, the claimant's condition was considered to be asymptomatic." (R. 17.) The Court notes, however, that the note indicating Plaintiff was asymptomatic for sarcoidosis was dated September 15, 1999. (R. 158.) Additional evidence in the record indicates that, on September 10, 1999, Plaintiff underwent a mediastinoscopy for this condition (R. 147), on September 13, 1999, Plaintiff reported to the emergency room with chest pain, coughing and shortness of breath (R. 160-61) and, in December of 1999, Plaintiff was treated for chest pain, difficulty breathing and a cough producing yellowish phlegm. (R. 170-73.) Moreover, Plaintiff's chest X-ray evaluation in December of 1999 indicated a clinical history consistent with sarcoidosis and she was given Prednisone and Flonase. (R. 173, 184.)

she never attempts to actually explain (and medically explain where medical evidence was involved) why the above-described evidence that is favorable to Plaintiff's claim of disability is overcome by evidence that is unfavorable. Herein, the ALJ improperly either entirely ignored or (at a minimum) failed to address relevant evidence that potentially substantiated Plaintiff's claims by picking and choosing among the evidence and ultimately relying on unfavorable evidence to substantiate her finding that Plaintiff is not disabled. *See e.g.*, *Binion v. Chater*, 108 F.3d 780, 788-79 (7th Cir. 1997)(*citing Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). *See also Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1996)(an ALJ may not "play doctor" and substitute his own opinion for that of a physician, or make judgments that are not substantiated by objective medical evidence).

The Seventh Circuit's decision in *Golembiewski v. Barnhart*, 322 F.3d 912 (7th Cir. 2003) is squarely applicable on this issue. In that case, the court remanded the cause to the Commissioner for further proceedings, *inter alia,* because:

> [T]he ALJ ignored significant [medical] evidence supporting his claim. The ALJ must evaluate the record fairly. Thus, although the ALJ need not discuss every piece of evidence in the record, *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001), the ALJ may not ignore an entire line of evidence that is contrary to the ruling, *Zurawski*, 245 F.3d at 888. Otherwise it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence. *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000). A remand is required here because the ALJ improperly ignored . . . lines of evidence. 322 F.3d at 917.

*See also Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003)(case remand because *inter alia* the ALJ's opinion did not sufficiently discuss the conflicting evidence regarding the claimant's impairments and failed to mention the strongest piece of evidence supporting the claimant's claim for benefits). Therefore, a remand on this issue is warranted.[28]

---

[28]Plaintiff argues that the ALJ further erred in her RFC finding of Plaintiff when she found that Plaintiff could stoop occasionally even though her flexion and extension of her lumbar spine was limited from 0 to 30 degrees (out of a possible 90 degrees). (Pl.'s Mem. at 14-15; R. 133, 136.) Plaintiff thus asserts that the ALJ failed to resolve the inconsistency that she could occasionally stoop with the objective medical findings, based on Dr. Suvanich's examination and

## II. THE ALJ ERRED IN HER CREDIBILITY DETERMINATION AS TO PLAINTIFF.

Plaintiff asserts that the ALJ's credibility determination is insufficient as a matter of law and

finding, indicating she had limited flexion and extension of her lumbar spine. (Pl.'s Mem. at 14-15; Pl.'s Reply at 10.) Defendant, however, avers that substantial evidence supports the ALJ's decision because two state agency physicians (i.e., Dr. Boyd McCracken and Dr. E.C. Bone) opined, that although Plaintiff's decreased range of lumbar motion would not accommodate frequent bending, she would still be capable of occasionally stooping. (Def.'s Mem. at 16, R. 139.)

The Court agrees with Plaintiff and finds that the case cited by Plaintiff, *Golembiewski v. Barnhart,* 322 F.3d 912 (7th Cir. 2003), is directly on point. In *Golembiewski,* the Seventh Circuit *inter alia* remanded the cause for further consideration because:

> [T]he ALJ's decision contains no discussion of Golembiewski's limited ability to bend on account of his bad back. After an examination in August 1997, Dr. Schroeder reported that Golembiewski could rotate his neck only 60 degrees and that motion in his lower back was reduced to 40 degrees of flexion, 15 degrees of extension, and 10 degrees of tilting. In contrast, Dr. Davis opined in his July 1999 report for the State of Indiana that Golembiewski could "stoop occasionally," meaning that he could bend at the waist for up to a third of an eight-hour day. *See* SSR 83-14. The reports of Dr. Schroeder and Dr. Davis thus establish potentially conflicting assessments of Golembiewski's bending ability. Yet despite this obligation to resolve such conflicts, *e.g., Scott,* 297 F.3d at 596; *see also Godbey v. Apfel,* 238 F.3d 803, 808 (7th Cir. 2000), the ALJ did not address either doctor's assessment-a significant omission since Golembiewski would have to bend at the waist occasionally in order to perform light work, SSR 83-10, *see Lauer v. Apfel,* 169 F.3d 489, 492 (7th Cir. 1999). 322 F.3d at 917.

Accordingly, the ALJ erred in not resolving the potential conflict between Dr. Suvanich's (consultative examiner) medical assessment that Plaintiff had limited flexion and extension of her lumbar spine (0 to 30 degrees) and Dr. McCracken's and Dr. Bone's (state agency reviewing physicians) medical assessments that Plaintiff could occasionally stoop. (R. 133, 136, 139.) Moreover, it bears noting that Dr. McCracken and Dr. Bone did not examine Plaintiff; rather, they merely reviewed Plaintiff's medical record. *See e.g.,* 20 C.F.R. § 416.927(d)(1)(more weight is given to the opinion of a physician who has examined the claimant than one who did not examine the claimant); *Allen v. Weinberger,* 552 F.2d 781, 786 (7th Cir. 1977)(regarding the conclusions of the physicians who merely reviewed the plaintiff's medical file and performed no examinations, the court noted, ". . . the weight to be attached to the reports must be considered in light of the fact that neither physician examined the plaintiff . . . Their reports, without personal examination of the claimant, deserve little weight in the overall evaluation of disability. The (medical) advisers' assessment of what other doctors find is hardly a basis for competent evaluation." 552 F.2d at 786. (Parenthetically, the Court notes that the ALJ never mentions Dr. McCracken's and Dr. Bone's medical assessments in the body of her decision, but basis her RFC finding, in part, on their assessments.)

patently wrong. (Pl.'s Mem. at 8.) Specifically, Plaintiff avers that the ALJ failed to follow the mandates of SSR 96-7p and regulatory requirements in assessing Plaintiff's credibility. (*Id.*) Defendant, on the other hand, asserts that the ALJ properly found that the objective medical evidence did not substantiate Plaintiff's subjective complaints of extreme pain and physical limitations. (Def.'s Mem. at 9.)

An ALJ's credibility determination will not be overturned by a court unless it is "patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). It is well-established, however, and it need be emphasized that the ALJ's written decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brindisi v. Barnhart,* 315 F.3d 783, 787 (7th Cir. 2003)(*quoting* Social Security Ruling 96-7p, 1996 WL 374186, at *4 (S.S.A. July 2, 1996)); *Lopez v. Barnhart,* 336 F.3d 535, 539-40 (7th Cir. 2003); *Golembiewski,* 322 F.3d at 915. Without an adequate explanation, neither the claimant nor subsequent reviewers will have a fair sense of how the claimant's testimony is weighed. *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001). Thus, the ALJ is required to state which of plaintiff's complaints she rejected and why such complaints were unsupported by the record. *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000). Accordingly, the ALJ must build an "accurate and logical bridge from the evidence to his conclusion." *Lopez,* 336 F.3d at 539 (*quoting Clifford,* 227 F.3d at 872).

Initially, the Court notes the ALJ failed to explicitly state why she disbelieved much of Plaintiff's testimony. For example, the ALJ never stated *inter alia* why she did not believe Plaintiff's testimony regarding her inability to concentrate while working due to severe back and leg pain, her

inability to sustain employment due to the fact that she was frequently absent or needed to leave early due to back pain, her need to frequently shift between standing and sitting positions, her inability to bend at the waist, her allegation regarding the fact that she spits up mucus frequently throughout the day, experiences difficulty breathing due to sarcoidosis and frequent respiratory infections, her need to take frequent baths to relieve her pain, her allegation that she is never able to totally relieve her pain, and her inability to lift more than five pounds. (R.196, 207, 217, 219, 220, 221-22.) According, the Court finds that the ALJ erred by failing to address specific testimony and articulating her reasons for either accepting or rejecting Plaintiff's testimony.[29] *See e.g., Brindisi,* 315 F.3d at 787; *SSR* 96-7p.

Next, with respect to the ALJ's credibility finding of Plaintiff, the Court notes the ALJ made a number of errors.[30] First, in reference to Plaintiff's sarcoidosis, the ALJ stated that "Her doctors

---

[29]Defendant argues that an ALJ's credibility finding will not be reversed merely because the ALJ did not "specify which statements were incredible" or because the ALJ "did [] not provide an evidentiary basis for the credibility finding." *Jens v. Barnhart,* 347 F.3d 209, 213 (7th Cir. 2003). (Def.'s Mem. at 8-9.) In *Jens,* the Seventh Circuit found that these types of omissions did not demonstrate that the ALJ's credibility finding was not supported by substantial evidence because the record as a whole provided adequate support for the ALJ's credibility finding. *Id.*

The Court, however, finds Defendant's argument unavailing, because as discussed in the first section of this opinion, the ALJ erred by ignoring or failing to address specific relevant objective medical evidence. Accordingly, unlike *Jens,* the ALJ's credibility finding cannot be upheld because the evidentiary record (i.e., specific medical findings and assessments of severe back and leg pain and sarcoidosis) as a whole does not support such a finding. Rather, Plaintiff's subjective complaints of severe pain and physical limitations have support in the record.

[30]The Court notes that the ALJ found that Plaintiff had a "generally unpersuasive demeanor while testifying at the hearing." *See e.g., Jens v. Barnhart,* 347 F.3d 209, 213 (7th Cir. 2003)(*quoting Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000) ("because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determination special deference. We will reverse an ALJ's credibility determination only if the claimant can show it was patently wrong.") Thus, while the Court recognizes that the ALJ's credibility determination should be given deference, herein, there are numerous factual errors contained in the ALJ's written decision with respect to Plaintiff's credibility.

have stated she is asymptomatic for this impairment and there is no reason for her not to return to work. This statement was noted in the claimant's treatment records when she was consistently calling her doctors, not because of pain or symptoms, but because she wanted them to complete forms for public aid stating she was unable to return to work." (R. 18.) The record, however, demonstrates that Plaintiff only called her physician on two different days, September 15, 1999 and September 16, 1999, regarding public aid forms. (R.158-59.) Considering the Plaintiff's entire medical record in context, and that these are the only two documented telephone calls indicating that Plaintiff contacted her physician regarding public aid forms, the ALJ's finding with regard to this issue is erroneous and based on an inference not supported by the record. *See e.g., Herron*, 19 F.3d at 335-36 (an ALJ's credibility finding will be overturned when it is based on unreasonable inferences and inferences not supported by the record).

In her decision, when referring to Plaintiff's lack of compliance with her physicians' recommendations regarding Plaintiff's back brace and medications, the ALJ makes erroneous statements and findings that are not supported by the record. For example, with regard to Plaintiff's back brace, the ALJ states that "[Plaintiff] has been given a back brace, which she admits to not wearing frequently, and she did not have it on during the hearing." (R. 18.) Plaintiff, however, testified that she would wear her back brace most of the day, but she did not leave it on all day because "sometimes it bec[ame] hot and uncomfortable because it has metal plates at the back of it. And it does not help. Once the pain starts, it does not help relieve [it]."[31] (R. 202.) Moreover,

_____

[31]Plaintiff testified as follows when questioned by the ALJ regarding her back brace:

Q. Do you wear it [back brace]?
A. Yes, I do.
Q. How often do you wear it?

(continued...)

Plaintiff explained that she had not worn her back brace to the hearing because her youngest child had taken the metal plates out of the back of it and she did not have time to locate them before she left for the hearing. (R. 223.)

In addition, with respect to Plaintiff's noncompliance in taking medications, the ALJ stated that she was "not currently taking any pain medications, another reason to doubt the extent of her symptoms." (R. 18.) Plaintiff, however, testified that while she had been prescribed about four different pain medications, she had exhausted all of her refills and her physicians had told her to take over-the-counter medications in a combination that would alleviate her pain. (R. 201.) She stated she attempted to control her pain with over-the-counter medications using various dosages and combinations, but these medications "[did] not stop the pain. [They] make[] it bearable." (R. 205.) Thus, in reference to Plaintiff's lack of compliance in wearing her back brace and taking pain medications, the ALJ states "Although these forms of treatment are not aggressive, their ability to reduce her symptoms can not be known because of the claimant's lack of compliance, and the non-compliance and lack of treatment are inconsistent with the alleged severity of her impairments." (R. 18.) However, based on Plaintiff's testimony, these methods of treatment are known and, in fact, they do not alleviate Plaintiff's pain; rather, they make it more bearable.[32] (R. 201, 202, 205, 223.)

---

[31](...continued)
A. I wear it when I go walking. When I'm standing. When I'm sitting around at home. When I'm going to clean my house.
Q. Well, that[] sounds like - - I mean, that sounds like about everything. Are you wearing it all day?
A. For the most part, not all day, because sometimes it becomes hot and uncomfortable because it has metal plates at the back of it. And it does not help. Once the pain starts, it does not help relieve [the pain]. Whenever it goes out the only thing that will ease the pain, not totally, is a hot bath. (R. 202.)

[32]Treatment notes from May 28, 1998 indicate Plaintiff's back pain was relieved when
(continued...)

Accordingly, the ALJ erred in her credibility finding with respect to these two issues.

With regard to the ALJ's reference to Plaintiff's missed appointments and failure to consistently seek medical treatment, the Court finds the ALJ also erred in her credibility finding with regard to these issues. For instance, the Court notes that the ALJ infers that Plaintiff's allegations of pain are not credible based on the amount of time between when Plaintiff initially sought treatment for back pain in August of 1997 and when she sought follow-up treatment in May of 1998, and states "This is a length amount of time for someone in constant pain." (R. 18.) Nowhere in the decision, however, does the ALJ note Plaintiff's limited financial resources, her difficulty in securing transportation and that sometimes she does not leave home because of weather conditions that affect her lung disease. (R. 200, 213-14, 230.) Moreover, Plaintiff testified that the most effective pain relief method that really worked for her was a hot bath, and she took several of these during the day and sometimes in the middle of the night. (R. 202, 220.) Furthermore, Plaintiff stated that her daughter often rubbed her leg to help relieve her pain. (R. 220.) Accordingly, the ALJ's credibility finding with respect to this issue is not supported by the record.[33]

---

[32](...continued)
she took 400 milligrams of Motrin. (R. 18, 128.) This medical evidence is not inconsistent with Plaintiff's testimony because, as she testified, she experienced pain relief from her pain medications; however, her pain was never totally alleviated. (R. 205.)

[33]Defendant asserts that to the extent Plaintiff claims she could not afford medications and/or medical treatment, Plaintiff testified she had a medical card from public aid. (Def.'s Mem. at 11; R. 215, 221.) In her decision, however, the ALJ does not rely on or make reference to the fact that Plaintiff had a medical card from public aid. Thus, it bears noting, respectfully, that Defendant's counsel is attempting to inappropriately provide the Court with a *post hoc* rationalization for the ALJ's credibility finding by inferring that Plaintiff pain allegations are not credible because she could have obtained medications and/or sought medical by using her medical card. (Def.'s Mem. at 11.) However, Defendant's argument cannot be considered. *See e.g., Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003)("general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of (continued...)

Next, the Court notes that the ALJ mischaracterized the record with regard to Plaintiff's ability to engage in prolonged walking and standing. (R. 18.) For instance, the ALJ notes that Plaintiff "is able to walk to the grocery store two blocks away and back" and noted that "This distance would be devastating to someone in constant pain and with [a] reduced ability to walk." (R. 18.) Moreover, the ALJ noted that Plaintiff "would be carrying additional weight on her return trip, assuming she bought any groceries" and "This would be an additional aggravation for someone with her alleged amount of back and knee pain." (R. 18.) At the administrative hearing, however, Plaintiff testified that she could not walk and carry a bag of groceries at the same time and if she goes to the store, she is accompanied by "someone [who] can carry the bags." (R. 206-07.) Thus, contrary to the ALJ's findings, the fact that Plaintiff can walk two blocks does not establish that she has the ability to engage in prolonged walking and standing (or carry bags of groceries that distance); which would consequently undermine her credibility regarding her severe pain and limitations.[34]

Moreover, in her decision, the ALJ finds that Plaintiff's allegations regarding her physical limitations are inconsistent with her daily activities. (R. 17-18.) The ALJ notes that Plaintiff's daily activities entail cooking, doing laundry, going shopping with her daughter, attending church two to

---

[33](...continued)
the agency's decision that were not given by the ALJ.") *See also Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)("But regardless of whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [her] decision and [we] confine our review to the reasons supplied by the ALJ.")

[34]Herein, the ALJ did not rely on any medical evidence to support the assumption that an individual with *inter alia* spondylolisthesis, nerve and joint disease, a limited range of motion, and severe lower back and leg pain could not walk even two blocks. *See e.g., Scivally v. Sullivan*, 966 F.2d 1070, 1071, 1077 (7th Cir. 1991)(the ability to walk a mile and a half daily has been found not to support a negative credibility finding for a claimant who testified to significant problems in standing and walking).

three times per month, staying at home with her four year old son every day (although she does not do anything with her son and lets him run around), and occasionally attending her children's activities. (R. 18.)

The Court finds, however, that Plaintiff's daily activities are fairly restricted and not the type of activities that undermine or contradict her claim of disabling impairments. *See e.g., Zurawski*, 245 F.3d at 887 (finding that the plaintiff's activities "are fairly restricted (*e.g.*, washing dishes, helping his children prepare for school, doing laundry, and preparing dinner) and not of a sort that necessarily undermines or contradicts a claim of disabling pain"); *Clifford*, 227 F.3d at 872 (noting "minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity"). Herein, the ALJ's analysis of Plaintiff's limited and restricted daily activities does not necessarily equate with her ability to perform the full range of exertional and non-exertional work-related activities.[35] *See e.g., Brown v. Massanari*, No. 00 C 6839, 2001 WL 1315075, at *2 (N.D. Ill. Oct. 26, 2001); *O'Connor v. Sullivan*, 938 F.2d 70, 74 (7th Cir. 1996). Thus, the ALJ should have explained the inconsistencies between Plaintiff's daily activities, her complaints of pain, and the medical evidence. *Zurawski*, 245 F.3d at 887.

The ALJ also found that "the objective medical findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations. (R. 16.) The Court notes that the ALJ never explained this finding and, based on the evidentiary record, as discussed

---

[35]Defendant asserts that *Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002) supports the ALJ's conclusion as to her daily activities. (Def.'s Mem. at 14.) In *Johansen,* however, the Seventh Circuit did not reach this issue and, unlike here, stated in regard to the claimant's daily activities, "In any event this is a question we need not decide because, even assuming that Johansen's activities can be characterized as minimal, the ALJ's decision adequately explained how Johnasen's allegation that he could not perform light work was inconsistent with the record viewed as a whole." *Johansen,* 314 F.3d at 288.

*supra,* there are a number of objective medical diagnoses and assessments (including bilateral bilateral spondylolysis, nerve and joint disease, a limited range of motion, and severe lower back and leg pain) which could substantiate Plaintiff's subjective complaints of severe pain and limitations. Therefore, the ALJ fails to explain in what manner this evidence fails to support Plaintiff's testimony regarding her severe lower back and leg pain. *See e.g., Scivally,* 966 F.2d at 1077 (holding that the ALJ's dismissal of the claimant's complaints of pain as not being supported by clinical signs and findings was unsustainable because at no point did the ALJ or the Appeals Council find that the claimant's severe impairment entailing a severe degenerative alteration of the spine, could not be reasonably expected to produce pain).

Therefore, for the aforesaid reasons, the Court finds the ALJ erred in her credibility determination by finding that Plaintiff was not credible. Accordingly, a remand on this issue is warranted.

**III.   THE ALJ SHOULD HAVE OBTAINED A REVIEW FROM A MEDICAL EXPERT(S).**

The procedure for adjudicating a social security disability insurance benefits claim differs significantly from the adversarial model. *Green v. Apfel,* 204 F.3d 780, 781 (7th Cir. 2000). The procedure requires the ALJ to summon a medical expert if there is not an adequate medical basis in the record for determining whether the claimant is disabled. *See id.* (stating that the procedure for adjudicating social security disability claims "requir[es] the administrative law judge to summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled.") In *Green, inter alia* "[t]he administrative law judge refused to believe [the plaintiff's] 'complaints of debilitating pain and limitations' because they were disproportionate to the objective medical findings in the record." *See id.* The ALJ, however, did not summon a medical expert. *See*

*id.* Accordingly, the case was remanded by the Seventh Circuit to the Commissioner for further proceedings.

Herein, similar to *Green*, considering the unaddressed objective medical evidence, and because the ALJ believed that Plaintiff's subjective complaints of severe pain and physical and mental limitations were not reasonably supported by the medical evidence, the ALJ should be required to summon a medical expert or experts to provide an informed basis for the decision herein. Therefore, because the ALJ lacked an informed basis necessary to make his decision and ultimately, played doctor by making an independent medical judgment, a remand is warranted. *See e.g., Blakes v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003)("[T]he ALJ should have summoned an expert to provide an informed basis for determining whether [the claimant] was disabled.")

## CONCLUSION[36]

In view of the foregoing, the Court recommends that Plaintiff's Motion for Summary Judgment be granted insofar as it requests a remand and recommends that Defendant's Motion for Summary Judgment be denied. Accordingly, it is recommended that the cause be remanded, pursuant to sentence four of 42 U.S.C. § 405, to the Commissioner for further proceedings consistent with this opinion.

---

[36]In view of the Court's ruling herein, it is deemed unnecessary to consider Plaintiff's and Defendant's other arguments raised herein. The parties may, for example, present their arguments with respect to whether the ALJ erred in failing to give controlling or greater weight to the opinions of Plaintiff's treating physician regarding the amount of weight she can lift (i.e., limit weight lifting to below ten pounds). (Pl.'s Mem. at 17-19; Def.'s Mem. at 17; R. 128.) Moreover, the parties may also present their arguments with respect to whether the ALJ erred in failing to consider the concessions made by the vocational expert on cross-examination. (Pl.'s Mem. at 16-17; Def.'s Mem. at 17-20.)

ENTER:

IAN H. LEVIN
U.S. Magistrate Judge

Dated:   January 15, 2004

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the Magistrate Judge's Report and Recommendation. *See Fed.R.Civ.72(b)*; 28 U.S.C. § 636(b)(1)(B); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 329 (7th Cir. 1995); The *Provident Bank v. Manor Stell Corp.*, 882 F.2d 258 (7th Cir. 1989).

**Copies Have Been Delivered
In Open Court or Mailed To:**

Barry A. Schultz
The Law Offices of Barry A. Schultz, P.C.
1609 Sherman Ave., Suite 207
Evanston, IL 60201
Attorney for Plaintiff

Kathryn A. Beverly
Special Assistant United States Attorney
200 West Adams St., 30th Floor
Chicago, IL 60606
Attorney for Defendant